## CASE-SWAYNE CO., INC. *v.* SUNKIST GROWERS, INC.

No. 66. Argued October 18–19, 1967.—Decided December 18, 1967.

*William H. Henderson* argued the cause for petitioner. With him on the briefs were *W. Glenn Harmon* and *Richard A. Perkins.*

*Seth M. Hufstedler* argued the cause for respondent. With him on the brief were *Charles E. Beardsley* and *Donald D. Stark.*

ˑMR. JUSTICE MARSHALL delivered the opinion of the Court.

This is a treble-damage action under § 4 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 15, for alleged violations of both § 1 and § 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. §§ 1, 2. The District Court granted a directed verdict, at the close of plaintiff's case, for the defendant, Sunkist Growers, Inc. The Court of Appeals for the Ninth Circuit reversed as to that portion of the complaint predicated on § 2 of the Sherman Act, holding that sufficient evidence was presented that Sunkist monopolized or attempted to monopolize trade in the relevant market; [1] it affirmed as to the dismissal of the Sherman Act § 1 charge, holding that Sunkist qualified as a cooperative organization under the Capper-Volstead Act, 42 Stat. 388, 7 U. S. C. § 291,[2] and therefore could

---

[1] 369 F. 2d 449 (1966), cert. denied, 387 U. S. 932 (1967). See *Maryland & Virginia Milk Producers Assn.* v. *United States,* 362 U. S. 458 (1960); *Sunkist Growers, Inc.* v. *Winckler & Smith Citrus Products Co.,* 370 U. S. 19 (1962).

[2] Section 1 of the Act reads:

"Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes: *Provided, however,* That such associations are operated for the mutual benefit of the members thereof, as such producers, and conform to one or both of the following requirements:

"First. That no member of the association is allowed more than

not be held for any intraorganizational conspiracy to restrain trade. In order to determine the scope of that exemption from the antitrust laws, we granted certiorari. 387 U. S. 903 (1967).

The issue is whether Sunkist is an association of "[p]ersons engaged in the production of agricultural products as . . . fruit growers" within the meaning of the Capper-Volstead Act, notwithstanding that certain of its members are not actually growers. We hold that it is not.

## I.

The organizational structure of the Sunkist system is as follows. At the base are some 12,000 growers of citrus fruit in Arizona and California. The growers are organized into "local associations," as they are designated in Sunkist's bylaws, numbering approximately 160, each of which operates a packing house for the preparation of the fruit for market. The vast majority of these local associations—about 80% by number and 82% by volume of fruit marketed in the Sunkist system—are, it is stipulated, cooperative associations in which all members are fruit growers.[3] A few of the local associa-

---

one vote because of the amount of stock or membership capital he may own therein, or,

"Second. That the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum.

"And in any case to the following:

"Third. That the association shall not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members." 7 U. S. C. § 291.

[3] "Limitation of membership in local associations to actual citrus-fruit producers is a cardinal principle of the Exchange [i. e., Sunkist] system." Gardner & McKay, California Fruit Growers Exchange System 88 (U. S. Dept. of Agriculture, FCA Cir. No. C–135 (1950)). See also Cumberland, Cooperative Marketing—Its Advantages as Exemplified in the California Fruit Growers Exchange 87 (1917). The corporate name of Sunkist prior to 1952 was the California Fruit Growers Exchange.

tions—no more than 5% by number and volume of fruit—are corporate growers whose total volume is sufficient to justify installation of their own packing house facilities.

The remainder of the local associations (also designated as "agency associations")—about 15% by number handling about 13% of the fruit in the Sunkist system—are private corporations and partnerships, owning and operating packing houses for profit. Their relationship to the growers whose fruit they handle is defined not by a cooperative agreement but by a marketing contract, *i. e.*, these packing houses contract with each grower to handle his fruit for cost plus a fixed fee. It is the membership of these agency associations in the Sunkist system that gives rise to the issue presented here.

The local associations, including these private packing houses, are members of "district exchanges," nonprofit membership corporations. The principal functions of the approximately threescore district exchanges are in the marketing of the fresh fruit of their member associations; they negotiate sales, arrange for shipment, and serve as conduits of communication between the local associations and Sunkist. Representatives of the district exchanges select the board of directors of Sunkist.

Sunkist itself, since 1958,[4] has two classes of "members": the district exchanges, whose principal member-

---

[4] In 1958, approximately the midpoint of the period relevant to this complaint, Sunkist altered its structure in two principal respects: first, local associations became members of Sunkist Growers directly, whereas under the old bylaws they had been represented through the district exchanges; second, two wholly owned corporate subsidiaries of Sunkist—Exchange Lemon Products Co. and Exchange Orange Products Co.—were merged into Sunkist. Since the parties have agreed that these changes in no way affect the issue here, we discuss Sunkist in its post-1958 form.

ship function is to select the board of directors, and the local associations, which vote on all other matters and which have the proprietary ownership of Sunkist's assets. The corporate entity Sunkist Growers, Inc., owns the trade name "Sunkist" under which the fruit of its members is marketed. It has an extensive sales organization; employs marketing and traffic specialists; and performs many other services for its members through, for example, its research facilities.

More particularly, Sunkist owns processing facilities for what is known as "product" fruit, i. e., fruit that for various reasons is not sold in the fresh fruit market, but rather is used for processed fruit products such as canned or concentrated juices.

Sunkist controls approximately 70% of the oranges grown in California and Arizona, and approximately 67% of the product oranges. This control is manifested through various contractual agreements. For example, each grower in the cooperative local associations agrees that he will market all of his fruit through his association. Each grower who contracts with an agency association packing house appoints it as the marketing agent for all of his fruit. That agreement is generally for five shipping seasons, although it may be canceled at any time "by mutual consent" or on written notice by the grower during August of any year in which it is in force. An escape clause permits the grower to sell such fruit as may be "mutually agreed upon" between him and the packing house to others, if he can obtain a price higher, in the judgment of the packing house, than that which the grower would obtain through his agreement with it. Should the grower be so released from his agreement, he is to pay to the packing house $2.50 per ton of fruit released.

Each of the local associations, including the private packing house agency associations, contracts with its

district exchange and with Sunkist Growers, Inc., to market all of its fruit—product and fresh—in the Sunkist system. Each association, under the Sunkist-District Exchange-Association Agreement, reserves the right to decide to what market it will ship and what price it is willing to receive for its fruit; however, Sunkist may decide to pool product fruit and fruit for export, in which event that fruit is handled solely in Sunkist's discretion. Sunkist also determines "the maximum amount of fresh fruit to be marketed currently," and allocates the "opportunity to ship equitably among Local Associations." Each local association agrees not to release any of its growers from the marketing contract without notifying its district exchange and Sunkist, and must obtain the approval of both if releases total more than 5% of the volume of the particular variety of fruit handled by the association. Further, each district exchange and local association agrees that "[a]ll prices, quotations and allowances shall be issued and distributed solely by Sunkist."

Petitioner Case-Swayne manufactures single-strength orange juice and other blended orange juices. In its complaint, insofar as relevant to the issues here, petitioner charged that the Sunkist system was a conspiracy in restraint of trade in violation of § 1 of the Sherman Act, the effect of which was to limit sharply the supply of product citrus fruit available to petitioner during the period covered by the complaint.

## II.

Section 1 of the Capper-Volstead Act (see n. 2, *supra*) privileges collective activity in processing and marketing on the part of "[p]ersons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers . . . ." 42 Stat. 388, 7 U. S. C. § 291. Despite that specific language, Sunkist

argues that Congress, in enacting the measure, intended to give sanction to any organizational form by which the benefits of collective marketing inured to the grower; and that, because the agency packing houses, by charging cost plus a fixed fee [5] for their services, do not participate directly in the gain or loss involved in the collective marketing of fruit through the Sunkist system, they are in the Sunkist system a privileged form of organization for the growers who contract with them.[6] We think that argument misconceives the requirements of the Act and runs counter to the relevant legislative history.

Congress enacted § 6 of the Clayton Act in response to the urgings of those who felt the Sherman Act's prohibition against combinations in restraint of trade might be applied to imperil the development of cooperative en-

---

[5] Under the marketing contract, the agency packing house obtains for its services "all of its costs of every kind incurred in connection with" processing and marketing the fruit; the so-called "fixed fee," in the contract in this record, is an amount "not in excess of 5 cents per field box on grapefruit, 10 cents on oranges," etc. We are not advised how that fixed fee is determined, other than that it is the result of bargaining between the company and the grower. It may well be that the fixed fee is dependent on the benefits of collective marketing through Sunkist, in the limited sense that it represents to the parties what one can charge and the other can pay, both anticipating the return the grower may achieve through pooling his fruit with the Sunkist organization. The stipulation, we note, provides only that the agency association "does not itself participate in either the gain or loss involved in marketing fruit through Sunkist *beyond* the recovery of its costs and fixed fee for packing." (Emphasis added.) In our view, however, that discrepancy in the record is not crucial to the decision here.

[6] The majority below held that the issue here was resolved *sub silentio* in favor of Sunkist in *Sunkist Growers, Inc.* v. *Winckler & Smith Citrus Products Co.*, 370 U. S. 19 (1962). But nongrower participation in Sunkist was not pointed out nor was the issue raised in that case; indeed, it was conceded by the respondents there that Sunkist was a Capper-Volstead cooperative.

deavors, principally unions.[7]   That section provided that the antitrust laws were not to be "construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit," *i. e.,* such organizations were not to be deemed "illegal combinations or conspiracies in restraint of trade . . . ."   38 Stat. 731, 15 U. S. C. § 17.   From the standpoint of agricultural cooperatives, the principal defect in that exemption was that it applied only to nonstock organizations.   The Capper-Volstead Act was intended to clarify the exemption for agricultural organizations and to extend it to cooperatives having capital stock.[8]

The reports on both H. R. 13931, the predecessor bill that failed of passage, and H. R. 2373, which became the Capper-Volstead Act, state:

> "Section 1 defines and limits the kind of associations to which the legislation applies.   These limitations are aimed to exclude from the benefits of this legislation all but *actual farmers* and all associations not operated for the mutual help of their members *as such producers.*"   (Emphasis added.)   H. R. Rep. No. 24, 67th Cong., 1st Sess., 1 (1921); H. R. Rep. No. 939, 66th Cong., 2d Sess., 1 (1920).

That it was intended that only actual producers of agricultural products be covered by the legislation is demonstrated in the debates on the two bills, *e. g.,* the following

---

[7] See H. R. Rep. No. 627, 63d Cong., 2d Sess., 14–16 (1914); *Allen Bradley Co.* v. *Local No. 3,* 325 U. S. 797 (1945).

[8] The purpose and object of the limited exemption of the Capper-Volstead Act is fully discussed in *Maryland & Virginia Milk Producers Assn.* v. *United States,* 362 U. S. 458, 464–468 (1960); see also Hanna, Antitrust Immunities of Cooperative Associations, 13 Law & Contemp. Prob. 488 (1948).

exchange involving Senator Kellogg, a principal sponsor of the measure:

"Mr. CUMMINS. . . . Are the words 'as farmers, planters, ranchmen, dairymen, nut or fruit growers' used to exclude all others who may be engaged in the production of agricultural products, or are those words merely descriptive of the general subject?

"Mr. KELLOGG. I think they are descriptive of the general subject. I think 'farmers' would have covered them all.

"Mr. CUMMINS. I think the Senator does not exactly catch my point. Take the flouring mills of Minneapolis: They are engaged, in a broad sense, in the production of an agricultural product. The packers are engaged, in a broad sense, in the production of an agricultural product. The Senator does not intend by this bill to confer upon them the privileges which the bill grants, I assume?

"Mr. KELLOGG. Certainly not; and I do not think a proper construction of the bill grants them any such privileges. The bill covers farmers, people who produce farm products of all kinds, and out of precaution the descriptive words were added.

"Mr. TOWNSEND. They must be persons who produce these things.

"Mr. KELLOGG. Yes; that has always been the understanding." [9]

---

[9] 62 Cong. Rec. 2052 (1922). See also 60 Cong. Rec. 369 (1920) (remarks of Senator Lenroot). It is significant that an amendment was offered on the floor of the Senate to bring within the bill processors of agricultural products where the grower's return depended upon the price the processor obtained for the finished product, reference being made to the beet sugar manufacturer. 62 Cong. Rec. 2273 (1922). Like Sunkist's argument here, it was stated that "the beneficiary of this [amendment] would be the

To be sure, a principal concern of Congress was to prohibit the participation in the collectivity of the predatory middleman, the speculator who bought crops in the field and returned but a small percentage of their eventual worth to the grower. Sunkist focuses on the expression of that concern, urging that the agency associations are not such predatory middlemen. That focus is wide of the mark. We deal here with "special exceptions to a general legislative plan," *Allen Bradley Co.* v. *Local No. 3*, 325 U. S. 797, 809 (1945) (§ 6 of the Clayton Act), and therefore we are not justified in expanding the Act's coverage, which otherwise appears quite plain. The Act states those whose collective activity is privileged under it; that enumeration is limited in quite specific terms to producers of agricultural products.[10]

Nor does the proviso in § 1—"[t]hat such associations are operated for the mutual benefit of the members thereof"—broaden the earlier language. That provision, in conjunction with the other prerequisites for qualification under the Act—either that each member be limited to one vote without regard to the capital he furnished or

producer." *Id.*, at 2274. But as Senator Norris stated in opposition to the inclusion of the processors (*id.*, at 2275):

"They are not cooperators; they are not producers; it is not an organization composed of producers who incorporate together to handle their own products . . . ."

The amendment was rejected. *Id.*, at 2275, 2281.

[10] See Hulbert, Legal Phases of Farmer Cooperatives 170 (U. S. Dept. of Agriculture, FCS Bull. No. 10, 1958):

"This and other language which appears in the act make it plain that a cooperative, to come within the act, must be composed of producers."

See also Hulbert, Legal Phases of Cooperative Associations 45 (U. S. Dept. of Agriculture, Bull. No. 1106, 1922); Mischler, Agricultural Cooperative Law, 30 Rocky Mt. L. Rev. 381, 385 (1958); 36 Op. Atty. Gen. 326, 339 (1930); Note, 44 Va. L. Rev. 63, 69–70, 100 (1958).

that dividends on capital be limited to 8%, and that dealings in products of nonmembers be limited—was designed to insure that qualifying associations be truly organized and controlled by, and for, producers. In short, Congress was aware that even organizations of producers could serve a purpose other than the mutual obtaining of a fair return to their members, as producers, or be controlled by persons other than producers, and the proviso adds a measure of insurance that such organizations do not gain the Act's benefits.[11] Moreover, virtually the only mention in the legislative history of possible participation in a Capper-Volstead cooperative by nonproducers occurs with respect to cooperatives issuing capital stock.[12] Whatever may be the effect and significance of that recognition of the financial stake of nonproducers in an otherwise solely producer organization, their participation and role being narrowly restricted by the voting and dividend prerequisites of the Act, they are unpersuasive here. Capital participation by nonproducers—and that is the extent to which the debates can fairly be read as contemplating their participation

---

[11] Cf. *Sheffield Farms Co.*, 44 F. T. C. 555 (1948); *Gold Medal Farms, Inc.*, 29 F. T. C. 356 (1939).

[12] *E. g.*, 62 Cong. Rec. 2271 (1922); 60 Cong. Rec. 365 (1920). Sunkist—a membership, rather than stock, corporation—points out that it, then known as the California Fruit Growers Exchange, was favorably referred to during the debates, see, *e. g.*, 62 Cong. Rec. 2052, 2267, 2271, 2277 (1922); 60 Cong. Rec. 312, 315, 360–361, 370 (1920). There is nothing to show, however, that Congress was aware that nonproducers participated in the marketing of fruit in the Sunkist system; in our reading of those references, it is more likely that Congress assumed the organization was solely of producers. For that matter, Senator Walsh, for one, doubted that the Exchange's federation of cooperative associations would even be encompassed by the Act (62 Cong. Rec. 2277–2278). In any event, we cannot take those remarks as intending specific approval of Sunkist, in light of the language of the Act and its other history.

at all[13]—does not directly enlarge the market share already possessed by the producers themselves. The participation in Sunkist of the agency associations has precisely that effect.

Sunkist suggests that "membership" of the agency associations has no "economic significance," relying on that provision of the Capper-Volstead Act permitting an association to deal in the products of nonmembers. The argument is that if the agency packing houses were not members of the Sunkist system, Sunkist would still be free to handle their products. But this Court has held that the antitrust implications of the relationship between a cooperative association and others is governed by entirely different standards. "The right of . . . agricultural producers thus to unite [under the Act] . . . cannot be deemed to authorize any combination or conspiracy with other persons in restraint of trade that these producers may see fit to devise." *United States* v. *Borden Co.*, 308 U. S. 188, 204–205 (1939); accord, *Maryland & Virginia Milk Producers Assn.* v. *United States*, 362 U. S. 458, 466–467 (1960). Moreover, the agency associations participate in the control and policy making of Sunkist, even though they may be private profit-making operations.[14] We think Congress did not intend to allow

---

[13] It was recognized, for example, that producers who desired to organize for collective marketing might not have, at the outset, the necessary finances to do so, and might therefore seek capital from nonproducers. See 60 Cong. Rec. 365 (1920) (remarks of Senator Walsh); 62 Cong. Rec. 2271 (1922) (same); 62 Cong. Rec. 2273 (1922) (remarks of Senator Norris). See also Hearings on H. R. 2373 before a Subcommittee of the Senate Judiciary Committee, 67th Cong., 1st Sess. (1921).

[14] As such, the agency association's interests may in some situations be antithetical to those of the growers with which it has contracted. For example, Sunkist has the power to review contracts between growers and the agency associations. Obviously, to the extent that the agency associations are represented in the councils of Sunkist, they in effect review their own contracts.

an organization with such nonproducer interests to avail itself of the Capper-Volstead exemption.[15]

The judgment below is reversed and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE HARLAN, concurring in part and dissenting in part.

I agree with the Court's holding that Congress did not intend that nonstock organizations with nonproducer members should qualify for the antitrust exemption conferred by § 1 of the Capper-Volstead Act, 7 U. S. C. § 291, and that the Sunkist system therefore is technically not a properly constituted Capper-Volstead cooperative. However, like my Brother WHITE, I am unable to ignore the possible effect of the Court's holding insofar as it subjects this large agricultural organization to antitrust liability extending far beyond the confines of this suit.

There is nothing in the record to indicate that Sunkist intended to evade the mandate of the Capper-Volstead Act when it allowed privately owned "agency association" packing houses to become members of the Sunkist system. Sunkist's only apparent motive in including the agency associations as members was to provide a greater range of packing facilities for citrus growers who desired to market through Sunkist. The agency associations have been an integral part of the Sunkist system for many years.[1] Until the bringing of the present action,

---

[15] All we decide is that Sunkist Growers, Inc., is not entitled to assert Capper-Volstead as a defense to the suit based on § 1 of the Sherman Act. We express no views on the merits of that suit.

[1] It appears that the agency associations have been members of the system at least since 1924. See McKay & Stevens, Organization and Development of a Cooperative Citrus-Fruit Marketing Agency 22–23 (U. S. Dept. of Agriculture, Bull. No. 1237, 1924).

this aspect of Sunkist's organization had apparently gone without challenge from private persons who dealt with Sunkist. Its legality never seems to have been questioned by any agency of government. Sunkist argued before us, without challenge to its sincerity, that the membership of the agency associations did not deprive it of antitrust immunity so long as all of its actions were taken for the benefit of the growers. There is no reason to doubt that this has been Sunkist's belief through the years.

In these circumstances, it seems inequitable that the membership of the agency associations should cause Sunkist to lose all of its previously assumed immunity from liability under § 1 of the Sherman Act. This would evidently be the consequence of the Court's holding, and if not mitigated in any way it would appear to expose Sunkist to very large liabilities. Many of the activities of a marketing organization the size of Sunkist presumably amount to restraints of trade, and under the Court's rationale Sunkist would be subject to treble damage suits in respect of all of them. The chief result would be to allow windfall treble damage recoveries to persons with whom Sunkist dealt at arm's length and in good faith. The main burden would ultimately fall on the growers at the base of the Sunkist organization.

I would hold that Sunkist is not liable under § 1 of the Sherman Act for past acts merely because the agency associations participated in its government by virtue of their membership. It seems to me that this result is not only more equitable but accords better with the basic purpose of Congress, which was to aid producers, than does the Court's holding, which burdens the growers with heavy potential liabilities. This belief is supported by the frequent reference in the congressional debates to the forerunner of this very organization as one which Congress intended by the Act to protect.[2]

---

[2] See n. 12, *ante*, at 394.

Sufficient precedent for this type of equitable mitigation is found in *Sunkist Growers, Inc.* v. *Winckler & Smith Citrus Products Co.*, 370 U. S. 19, in which this Court held that Sunkist's former "tripartite" structure did not deprive it of its § 1 immunity. The Court there stated that

> "To hold otherwise would be to impose grave legal consequences upon organizational distinctions that are of *de minimis* meaning and effect to these growers who have banded together for processing and marketing purposes within the purview of the Clayton and Capper-Volstead Acts." *Id.*, at 29.

The very words of Capper-Volstead § 1, however, make it clear that Congress granted antitrust immunity to agricultural cooperatives only on condition that all of the benefits of cooperative organization were received by agricultural producers. Therefore, I would also hold that Sunkist may not assert antitrust immunity if the damage complained of resulted from attempts by the agency associations to use their power within Sunkist for their own benefit as distinguished from that of the growers.

The Court holds, and, for the future, I agree, that even those organizations in which all gains are channeled to the producers may not qualify under Capper-Volstead § 1 if they have nonproducer members. Congress may have excluded nonproducers simply because it felt that the benefits to producers from nonproducer membership were outweighed by the dangers of admitting nonproducer foxes into the cooperative hen roost. However, as the Court recognizes, see *ante,* at 394– 395, the evident congressional concern about the possibility of monopoly by organizations immunized from antitrust prosecution by Capper-Volstead [3] indicates that in restricting membership to producers Congress

---

[3] See, *e. g.*, 62 Cong. Rec. 2217–2226, 2257–2280.

also intended to limit in a rough way the amount of market power which could be controlled by such organizations. The resources of nonproducers were to be available to the cooperatives, not through the broad avenue of membership, but by the narrower path of contract: the Act provides that qualifying organizations and their members "may make the necessary contracts and agreements" to effect the Act's purposes. To give effect to this legislative intent, I would hold that the marketing agreements of the agency associations with Sunkist and with individual growers must be tested by the standard applicable to contracts with nonmembers.

The Court of Appeals held that, treated as contracts with nonmembers, the agreements in question were proper under the Act. 369 F. 2d 449, 461–462. I agree. Regarded as contracts, these agreements provide essentially that a grower who desires to market through the Sunkist system and have his fruit packed by an agency association shall deliver to such association his entire crop for the year, that the agency association shall pack it in return for cost plus a fixed fee, and that the entire crop shall then be marketed by Sunkist. The contract may be canceled by the grower in August of any year. Since the main effect of these agreements is simply to give the growers who want to market through Sunkist a wider choice of packing facilities than they would enjoy if limited to cooperative packing houses, I would hold that the agreements are permissible when looked upon as contracts with nonmembers.

In accord with this opinion, I would remand the case to the District Court so that Case-Swayne may show what, if any, of the damage allegedly suffered by it resulted from actions taken by the agency associations for their own benefit as distinguished from that of the growers. I need hardly say that for the future Sunkist

would forfeit its entire Capper-Volstead antitrust exemption were it to elect to continue the membership of the agency associations.

MR. JUSTICE WHITE, with whom MR. JUSTICE STEWART joins, concurring in the result.

I agree with the Court's basic judgment that Congress intended to grant immunity from the antitrust laws only to the cooperative efforts of "[p]ersons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers . . . ." Arrangements between growers and nongrowers are subject to scrutiny under the antitrust laws. Under the controlling decisions any combination between Sunkist and nongrower packing houses, were they not members of Sunkist, would have to meet the standards of the antitrust statutes. *United States* v. *Borden Co.*, 308 U. S. 188 (1939). Making the nongrower a member of the cooperative should not and does not immunize grower-nongrower transactions from any of the antitrust laws. Despite such membership, these transactions continue to be forbidden if they violate § 1. Indeed, membership should itself be looked upon as an agreement or combination between growers and nongrowers which, if it restrains trade, is subject to suit under the Sherman Act. Hence, since the complaint in this case encompassed a charge that certain arrangements between Sunkist and the nongrower agency associations denied product fruit to Case-Swayne and violated the antitrust laws, I agree that it was error to dismiss the § 1 charge on immunity grounds.

But it does not follow that Sunkist has lost its antitrust immunity completely. The bulk of its members are grower cooperatives or marketing agencies, and the great majority of its transactions are dealings with and for the account of these agricultural cooperatives which Congress clearly intended to exempt from the antitrust laws. An

exempt organization may not conspire with an outsider to violate § 1, but if it does, it does not forfeit its immunity except for that transaction. I see no reason for a different consequence where the conspiracy or combination takes the form of granting membership in the exempt organization. If nongrower membership is a combination in restraint of trade or if any agreements between Sunkist and the nongrower member violate the Sherman Act, Case-Swayne should be able to collect treble damages for any injury flowing from such violations. But I see little basis for concluding that the membership of the agency association strips Sunkist of its status as an exempt cooperative and exposes it to what would be very extensive liability under the antitrust laws wholly unrelated to the nongrower affiliation.

At the base of the Sunkist organization are 12,000 growers who themselves are not members of Sunkist but who are members of local associations which operate packing houses and which pick, pack, and arrange for the marketing of the fruit grown by their members. Most of these local associations appear to qualify as exempt agricultural cooperatives. A relatively small number, however, the so-called agency associations, are privately owned packing houses which buy and pack the fruit of those growers with whom they contract. The local associations, including the agency associations, are in turn organized into district exchanges which, unless agency association membership disqualifies some of them, would seem also to be exempt cooperatives. The district exchanges are primarily marketing organizations. Sunkist, a member corporation, is at the top of the pyramid. Among other things, it has ultimate authority and responsibility for the marketing of both fresh and product fruit.

Membership in Sunkist is made up of the local associations and the district exchanges. The agency associations make up about 15% of the membership. They

have, however, no direct voice in the election of Sunkist directors since the selection of directors is vested in the exchange members alone. The directors have very wide authority to conduct the affairs of Sunkist. Under the charter and bylaws, general membership carries with it little power and influence. Membership does, however, involve the execution of a membership application and agreement binding the member to Sunkist's charter and bylaws, which give Sunkist extensive powers over the marketing of its members' fruit, including the power to confine the packing, processing, and marketing functions to the Sunkist family. In addition, local associations and exchanges apparently execute the standard "Sunkist-District Exchange-Association Agreement" which, among other things, contains the agreement by the local association to market fruit exclusively through the exchanges and by the exchange to market exclusively through Sunkist.

If Sunkist's exemption is completely lost because of the membership of the nongrower agency associations, several consequences follow. Those district exchanges which have nongrower members will likewise forfeit their exemption. The arrangements among Sunkist, exempt exchanges, and exempt local associations will be looked upon as arrangements between exempt and nonexempt organizations. Thus for all practical purposes the entire Sunkist structure will be exposed to antitrust liability for a great many transactions which are wholly between growers or between their cooperative organizations, transactions which Congress intended to exempt from the antitrust laws.

Neither the agency associations themselves nor their arrangements with growers are claimed by Sunkist to be Capper-Volstead cooperatives exempt because of that status from examination under the Sherman Act. Also, the contracts and arrangements between the agency associations, nonexempt entities, and the exchanges and

Sunkist, which should be treated as otherwise exempt entities, are themselves within the reach of § 1. Among these nonexempt arrangements is the membership of an agency association in either an exchange or Sunkist itself. Case-Swayne should be able to recover from Sunkist those damages which flow from restraints of trade resulting from the agreements between the agency associations and Sunkist or between the agency associations and the district exchanges and from the membership of the agencies in either Sunkist or the exchanges. But Case-Swayne should not recover for injury to its business caused by other intercooperative or intergrower transactions and not resulting from the forbidden relationship between an exempt and a nonexempt entity. This result, in my view, will more nearly serve the policy of Congress in granting antitrust exemption to growers and their cooperative activities.

I would remand to the District Court for a trial of the § 1 case under the above principles.

MR. JUSTICE DOUGLAS, *dubitante*.

I am not as certain as MR. JUSTICE WHITE appears to be that the immunity of the growers or cooperatives granted by the Capper-Volstead Act is only partially lost in case nongrowers combine with the growers or cooperatives. But the question is certainly not free of doubt and it has not been argued. Nor have the questions discussed by MR. JUSTICE HARLAN been fully presented and argued. So far as we can tell at this stage of the litigation, all of those problems may turn out to be wholly abstract. The extent, let alone the nature, of participation by nongrower elements in the agreements and practices alleged to violate the antitrust laws has indeed hardly been explored. Therefore I think it is the part of wisdom specifically to reserve the questions with regard to the scope of the immunity that may survive today's ruling.