**UNITED STATES of America, Plaintiff,**

v.

**Samuel HINOTE, Defendant.**

**Crim. A. No. J92–00107(L)(C).**

United States District Court,
S.D. Mississippi,
Jackson Division.

May 7, 1993.

Laura Heiser and John J. Hughes, U.S. Dept. of Justice, Antitrust Div., Middle Atlantic Office, Philadelphia, PA, for plaintiff.

Thomas A. Bergstrom, Philadelphia, PA, P.J. Townsend, Jr., Townsend, McWilliams & Holladay, Drew, MS, for defendant.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the motion of defendant Samuel Hinote to dismiss the indictment against him. The government has responded to the defendant's motion. The court, having considered the memoranda of authorities submitted by the parties, as well as evidence presented at a hearing on this matter, concludes that, for the reasons that follow, defendant's motion is not well taken and should be denied.

## BACKGROUND

The defendant in this case is charged with violating the Sherman Act, 15 U.S.C. § 1, by conspiring to fix the prices of catfish products sold in interstate commerce between 1981 and 1990. During the period covered by the indictment, the defendant was the President and Chief Executive Officer of Delta Pride Catfish, Inc. (Delta Pride), a catfish processor incorporated in the State of Mississippi and with its principal place of business

in Indianola, Mississippi.[1] The entities which allegedly conspired with the defendant to fix prices are also catfish processors located primarily in the State of Mississippi.[2]

The defendant seeks dismissal of the indictment on the ground that any conspiratorial price-fixing activity engaged in by him and the alleged co-conspirators was exempt from antitrust liability under § 1 of the Capper–Volstead Act, 7 U.S.C. § 291, and/or the Fisherman's Collective Marketing Act (Fisherman's Act), 15 U.S.C. § 521.[3] Essentially, the defendant's position is that, in addition to being catfish processors, Delta Pride and each of the alleged co-conspirators were also engaged in catfish farming and/or fishing at the time alleged in the indictment. And, as such, according to the defendant, these entities should be considered "farmers" and/or "fishermen" as defined in the two Acts, thus rendering the alleged antitrust violations for which the defendant has been charged lawful.

The government, on the other hand, maintains that the defendant and his co-conspirators should be viewed not as catfish "farmers" and/or "fisherman" within the meaning of Capper–Volstead or the Fisherman's Act, but rather, as catfish processors seeking protection of the exemption not to permit collectivized processing but simply as a shield for the price-fixing of finished catfish products. This conspiratorial conduct engaged in by the defendant and his co-conspirators, the government contends, is not protected from antitrust liability under either of the asserted Acts.

■ In determining whether or not an exemption applies in this case, the court must, of course, decide whether the defendant and his alleged co-conspirators qualify as "farmers" under the Capper–Volstead Act and/or "fisherman" under the Fisherman's Act.[4] To resolve this question, the court

---

1. Delta Pride's shareholders are catfish farmers who, based upon their shares in Delta Pride, are entitled to sell a certain percentage of their catfish crops to Delta Pride for processing. The shareholders/catfish farmers own the ponds and supply the feed and labor necessary to grow the fish. Delta Pride then purchases the grown fish and prepares them for sale.

2. The catfish processing companies alleged to have participated in the charged conspiracy are as follows: ConAgra, Inc. d/b/a Country Skillet Catfish Company; Farm Fresh Catfish Company; Freshwater Farms, Inc.; Southern Pride Catfish, Inc.; Magnolia Processing, Inc. d/b/a Pride of the Pond; and Simmons Farm Raised Catfish, Inc. With the exception of Southern Pride Catfish, Inc., which is located in the State of Alabama, each of the above processors' principal places of business is in the State of Mississippi.

3. Section 1 of the Capper–Volstead Act provides in pertinent part:

    Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes....

7 U.S.C. § 291. The statute further provides that any such association must be operated "for the

mutual benefit of [its] members; that it may not pay dividends of more than 8% annually on its stock or membership capital; and that it "shall not deal in the products of nonmembers to an amount greater in value that such as are handled by it for members." *Id.*

The Fisherman's Act is patterned after the Capper–Volstead Act and made applicable to fishermen and aquatic products. That Act provides:

    Persons engaged in the fishery industry, as fisherman, catching, collecting, or cultivating aquatic products, or as planters of aquatic products on public or private beds, may act together in associations, corporate or otherwise, with or without capital stock, in collectively catching, producing, preparing for market, processing, handling, and marketing in interstate and foreign commerce, such products of said persons so engaged.

    .   .   .   .   .

    Such associations may have marketing agencies in common, and such associations and their members may make the necessary contracts and agreements to effect such purposes. 15 U.S.C. § 521. This statute also requires that any such association "operate[] for the mutual benefit of [its] members; pay no more than 8% dividends annually on its stock or membership capital; and "not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members." *Id.*

4. While the defendant admits in his post-hearing brief that Capper–Volstead was the model for the Fisherman's Act, he further argues that the Fisherman's Act expands upon and is much broader than Capper–Volstead. At the hearing itself,

must look not only to the catfish-producing activities in which these entities were involved, but also to the catfish industry itself.

The production of catfish involves a number of distinct stages: production of fingerling fish through current stocks of mature fish; placement of fingerlings in ponds; aerating and maintenance of the ponds; production of feed for the fingerlings; feeding and raising of the fingerlings to market size; seining and live-hauling of the fish to processing facilities; operation of facilities to process and prepare the fish for market; and marketing of the fish for sale to consumers. As is apparent, the catfish industry has become highly specialized and departmentalized. Testimony given during the hearing evidences the fact that some stages which in the past might have been performed by different persons or enterprises are now often combined and controlled by a single entity.

■ Two of the entities with which the defendant allegedly conspired, Country Skillet Catfish Company (Country Skillet) and

Farm Fresh Catfish Company (Farm Fresh),[5] are subsidiaries of large food conglomerates.[6] Both Country Skillet and Farm Fresh are "integrated," that is, they are involved in more than one of these stages of production. As noted, Country Skillet and Farm Fresh each own and operate a processing plant where catfish are prepared for market. To sustain a supply of catfish for processing, Country Skillet and Farm Fresh utilize three different methods for obtaining fish. One method is through the use of what are called "feed grower contracts." Under these contracts, which are entered into with independent farmers, the processors place catfish fingerlings in ponds owned by the independent farmers, provide the farmers with feed and technical support, and then harvest the fish once they reach market size. Although the farmers are responsible for managing the ponds, the processors retain title to the fish while they are in the care of the independent farmers.

The two other methods through which Country Skillet and Farm Fresh obtain cat-

---

however, defendant's counsel stated that in the context of this case, the two Acts are, for the most part, interchangeable. In fact, defendant's counsel took the position that to the extent it makes a difference under which Act it is argued that an exemption applies in this case, it is a difference without any real distinction; if the conduct here is exempt, it is exempt under either Act. The government's position is the same as that of the defendant at the hearing on this matter—i.e., that the two Acts are virtually identical in their application to the instant case.

Having reviewed the two statutes, the court finds that though there are some differences between Capper–Volstead and the Fisherman's Act, the two Acts provide exemptions from antitrust liability for essentially the same activities, the primary difference being the fact that one Act applies to the agricultural industry and the other to the fishing industry. Thus, in view of the facts presented by this case, including defendant's argument that he and his alleged co-conspirators are both "farmers" and "fisherman" as those terms are defined in the two Acts, the court concludes that it does not matter under which Act the conduct at issue in this case is analyzed. As noted by the defendant at the hearing before this court, whether the conduct here is exempt or not, it is the same under either Act.

5. The evidence presented at the hearing pertained to only three of the defendant's alleged co-conspirators—Country Skillet, Farm Fresh and Magnolia Processing, Inc. d/b/a Pride of the Pond. For the reasons discussed *infra,* the court

finds that at the time charged in the indictment, neither Country Skillet nor Farm Fresh was qualified to act collectively in accordance with the Capper–Volstead Act. As the Supreme Court made clear in *National Broiler Marketing Ass'n v. United States,* 436 U.S. 816, 823, 98 S.Ct. 2122, 2127, 56 L.Ed.2d 728 (1978) (discussed further *infra* ), a defendant, in order to avoid antitrust liability under the Capper–Volstead Act, must establish more than just the fact that *he* is qualified to act collectively under the Act, but he must also establish that *all* those with whom he allegedly associated are likewise entitled to the Act's protection. Because the court is of the opinion that neither Country Skillet nor Farm Fresh falls within the limited exemption provided by the Capper–Volstead Act, the court, in determining whether the defendant has sustained his Capper–Volstead challenge to the indictment, need not decide if the other alleged co-conspirators hold exempt status under the Act. This opinion, therefore, will focus on the catfish-producing activities of Country Skillet and Farm Fresh as they relate to the defendant's claim of immunity pursuant to the Capper–Volstead Act.

6. Country Skillet is a division of ConAgra, Inc., a Delaware corporation with its home office in Omaha, Nebraska. Farm Fresh is a subsidiary of Geo. A. Hormel & Co., a Minnesota corporation. Both ConAgra and Hormel are large conglomerates with multi-billion dollar annual sales in the production of a wide variety of food products.

fish for processing are by either leasing ponds from a landowner and then raising the catfish on the leased acreage without any assistance from the landowner, or purchasing from independent farmers on the open market. During the period covered by the indictment, Country Skillet received about 50% of its fish from either leased ponds or through feed grower contracts, while the other 50% was purchased from independent farmers on the open market. Farm Fresh received about 35% of its fish from leased ponds and 40% by way of feed grower contracts, and purchased 25% on the open market.

## LEGAL ANALYSIS

As the leading Supreme Court case discussing the Capper–Volstead Act makes clear,[7] in order for the defendant to be exempt from antitrust liability under the Act, he must establish not only that Delta Pride was entitled to the Act's protection, but also, that all those entities with which he allegedly conspired were likewise qualified under the Act. See National Broiler Marketing Ass'n v. United States, 436 U.S. 816, 822–23, 98 S.Ct. 2122, 2127, 56 L.Ed.2d 728 (1978).[8] According to the Court:

The Capper–Volstead Act removed from the prescription of the antitrust laws cooperatives formed by certain agricultural producers that otherwise would be directly competing with each other in efforts to bring their goods to market. But if the cooperative includes among its members those not so privileged under the statute to act collectively, it is not entitled to the protection of the Act. Case–Swayne Co. v. Sunkist Growers, Inc., 389 U.S. 384, 88

S.Ct. 528, 19 L.Ed.2d 621 (1967). Thus, in order for [a cooperative] to enjoy the limited exemption of the Capper–Volstead Act, and, as a consequence, to avoid liability under the antitrust laws for its collective activity, all its members must be qualified to act collectively. It is not enough that a typical member qualify, or even that most of [the cooperative's] members qualify.

Id.

The National Broiler case involved a civil action brought by the United States against a nonprofit cooperative association of integrated producers of broiler chickens, the National Broiler Marketing Association (NBMA), alleging a conspiracy in violation of § 1 of the Sherman Act. The district court held that the NBMA's activities were exempt from the antitrust laws under the Capper–Volstead Act. Id. 436 U.S. at 819, 98 S.Ct. at 2125–26. The Fifth Circuit reversed, finding that certain NBMA members were more like middlemen and processors than they were like farmers in the ordinary meaning of the word. Id. (citing United States v. National Broiler Marketing Ass'n, 550 F.2d 1380, 1386 (5th Cir.1977)).

The Supreme Court, after reviewing extensively the legislative history of the Capper–Volstead Act, affirmed the Fifth Circuit. The Court concluded that "any member of NBMA that own[ed] neither a breeder flock nor a hatchery, and that maintain[ed] no grow-out facility at which the flocks to which it [held] title [were] raised, [was] not among those Congress intended to protect by the Capper–Volstead Act." Id. 436 U.S. at 827, 98 S.Ct. at 2130. The court reasoned that, because of their lack of involvement in actu-

---

7. Because it matters not whether the defendant's claim of exemption is analyzed under either the Capper–Volstead Act or the Fisherman's Act, see supra at note 4, the court's analysis, so as to avoid repetition, will refer only to the Capper–Volstead Act.

8. As noted previously, Delta Pride is owned entirely by catfish farmers. Testimony at the hearing revealed that Delta Pride was formed by these farmers so that they would not be taken advantage of by large processors that controlled the price at which catfish would be purchased from the farmers. The farmers formed Delta Pride to process and sell their own fish, and thus enable them to receive a larger portion of the

profit realized on the eventual sale of their catfish. If this case concerned nothing more than the collective actions of Delta Pride's shareholders/farmers in processing and marketing their own fish, the court would be compelled to find their activities exempt from antitrust liability under the Capper–Volstead Act. This case, however, is not so limited, but rather, concerns a charge of conspiracy to fix prices involving multiple entities in the business of processing and marketing catfish products, some of which the government contends are not "farmers" entitled to act collectively under the Capper–Volstead Act.

ally raising broiler chicks, such members were not "farmers" within the meaning of the Act. As stated by the Court:

> [T]he economic role of such a member in the production of broiler chickens [was] indistinguishable from the processor that enters into a preplanting contract with its supplier, or from that of a packer that assists its supplier in the financing of his crops. Their participation involve[d] only the kind of investment that Congress clearly did not intend to protect.

*Id.* at 827–28, 98 S.Ct. at 2130. Accordingly, "a cooperative organization that includes [such] members—or even one of them—as members is not entitled to the limited protection of the Capper–Volstead Act." *Id.* at 828–29, 98 S.Ct. at 2130.

In reaching its decision, the *National Broiler* Court expressly declined to consider either "the status under the Act of the fully integrated producer that not only maintains its own breeder flock, hatchery, and grow-out facility, but also runs its own processing plant[,]" or "the status of the less fully integrated producer that, although maintaining a grow-out facility, also contracts with independent growers for a large portion of the broilers processed at its facility." *Id.* at 828 n. 21, 98 S.Ct. at 2130 n. 21. It is these issues which now confront this court in the context of this case, the only difference being that this case involves the catfish industry whereas the *National Broiler* case concerned the chicken industry. Indeed, as is readily apparent from the above discussion of Country Skillet's and Farm Fresh's activities in the industry during the period covered by the indictment, both of those catfish producers maintained their own stock of fish, leased ponds as grow-out facilities, ran their own processing facilities and contracted with independent farmers for a substantial portion of the fish processed at their facilities. As such, the status of both Country Skillet and Farm Fresh under the Act would, in the court's opinion, be conclusively determined by resolution of the issues left open in *National Broiler.*

Though they have yet to be resolved by a majority of the Court, Justice Brennan, in his concurring opinion in *National Broiler,* wrote expressly to give consideration to these issues. Justice Brennan, as did the majority, began his analysis by reviewing the purpose behind the enactment of the Capper–Volstead Act as revealed in its legislative history:

> The Capper–Volstead Act, ... like the Sherman Act which it modifies, was populist legislation which reacted to the increasing concentrations of economic power which followed on the heels of the industrial revolution. The Sherman Act was the first legislation to deal with the problems of participation of small economic units in an economy increasingly dominated by economic titans. Next enacted was § 6 of the Clayton Act.... This legislation linked industrial labor and farmers as the kind of economic units of individuals for whom it was thought necessary to permit cooperation—cartelization in economic parlance—in order to survive against the economically dominant manufacturing, supplier, and purchasing interests with which they had to interrelate. The failure of § 6 expressly to authorize cooperative marketing activities, and to permit capital stock organizations under it, prompted enactment of the Capper–Volstead Act in 1922 to remedy these omissions.

> . . . . .

> At the time the Capper–Volstead Act was enacted, farming was not a vertically integrated industry. The economic model was a relatively large number of small, individual, economic farming units which actually tilled the soil and husbanded animals, on the one hand, and on the other hand, the relatively small number of large economic units which processed the agricultural products and resold them for wholesale and retail distribution. It was the disparity of power between the units at the respective levels of production that spurred this congressional action. *See, e.g.,* 62 Cong.Rec. 2257 (1922) (remarks of Sen. Norris). Congress was concerned that the farmer, at the mercy of natural forces on one hand, and the economically dominant processors on the other, was being driven from the land and forced to

migrate in ever-increasing numbers to the cities.

"Senator Capper stated a point of view to be found on almost every page of the congressional debate on his bill, 'Middlemen who buy farm products act collectively as stockholders in corporations owning the business and through their representatives buy of farmers, and if farmers must continue to sell individually to these large aggregations of men who control the avenues and agencies through and by which farm products reach the consuming market, then farmers must for all time remain at the mercy of the buyers.' 62 Cong.Rec. 2958."

The legislative history makes clear that the regime which Congress created in the Capper–Volstead Act to ameliorate this situation was one of voluntary cooperation. The Act would allow farmers to " 'combine with [their] neighbors and cooperate and act as a corporation, following [their] product from the farm as near to the consumer as [they] can, doing away in the meantime with unnecessary middle men.' That is all this bill attempts to do." 62 Cong.Rec. 2257 (1922) (remarks of Sen. Norris). As the Court notes, however, "[c]learly, Congress did not intend to extend the benefits of the Act to processors and packers to whom the farmers sold their goods, even when the relationship was such that the processor and packer bore a part of the risk." [National Broiler, 436 U.S. at 825–27, 98 S.Ct. at] 2129. This fact is demonstrated from several exchanges during the debate clarifying the intent behind the bill and also by the abortive Phipps amendment. In the colloquy between Senators Kellogg and Cummins, . . . an intent not to extend the benefits of the bill to processors of agricultural products is clear:

"Mr. CUMMINS . . . Take the flouring mills of Minneapolis: They are en-

gaged, in a broad sense, in the production of an agricultural product. The packers are engaged, in a broad sense, in the production of an agricultural product. The Senator does not intend by this bill to confer upon them the privileges which the bill grants, I assume?

"Mr. KELLOGG: Certainly not. . . ." 62 Cong.Rec. 2052 (1922).

Debate surrounding the proposed Phipps amendment,[9] . . . the effect of which would have been to exempt, for example, sugar refiners with preplanting contracts, yields a similar understanding. Senator Norris, in leading the successful rejection of the amendment, explained: "The amendment . . . is simply offered for the purpose of giving to certain manufacturers the right to be immune from any prosecution under the Sherman Antitrust Act. . . . They are not cooperators; they are not producers; it is not an organization composed of producers who incorporate together to handle their own products; that is not it." 62 Cong.Rec. 2275 (1922) (emphasis added). These statements show that Congress regarded both "manufacturers of finished agricultural products" and "processors" as ineligible. Whether or not there is a distinction in economic or other terms between "manufacturers" who refine sugar from beets, or "processors" who mill wheat into flour, both groups were thought of as beyond the reach of § 1—"They are not cooperators." Thus the legislative history demonstrates that the purpose of the legislation was to permit only individual economic units working at the farm level to form cooperatives for purposes of "collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged."

*National Broiler*, 436 U.S. at 829–33, 98 S.Ct. at 2130–33 (Brennan, J., concurring).

9. This amendment would have inserted the following language after "nut or fruit growers" in the text of the Capper–Volstead Act:

"and where any such agricultural product or products must be submitted to a manufacturing process, in order to convert it or them into a finished commodity, and the price paid by the manufacturer to the producer thereof is

controlled by or dependent upon the price received by the manufacturer for the finished commodity by contract entered in to before the production of such agricultural product or products then any such manufacturers." 62 Cong.Rec. 2227, 2273–2275, 2281 (1922) *National Broiler*, 436 U.S. at 826 n. 19, 98 S.Ct. at 2129 n. 19.

After discussing the legislative history of the Capper–Volstead Act, Justice Brennan turned to the dissent's argument in *National Broiler* that expansion of the exemption to include "integrated agribusiness [which] admittedly antiquates some of the congressional characterizations of farming" is necessary because of the fact that "[t]he nature of agriculture has changed profoundly since the early 1920's when the Capper–Volstead Act was debated and adopted." *Id.* at 843, 98 S.Ct. at 2137–38 (White, J., dissenting). This same argument has been presented by the defendant in this case. The court concludes, as did Justice Brennan, that such an expansion of the Act's coverage simply is not supported by the purpose behind its enactment. As Justice Brennan aptly stated:

> The issue is whether a fully integrated producer of agricultural products performing its own processing or manufacturing and which hence does not associate for purposes of common handling, processing, and marketing is nevertheless "engaged in the production of agricultural products as [a] farme[r]" for purposes of § 1's exemption for such cooperatives if also engaged in traditional farming activity. The dissent frankly recognizes that integrated ... producers do not neatly fit the limitation Congress signified by the phrase "as farmers," but reads that limitation out of the Act in order to give effect to what it perceives as Congress' desire to aid the agricultural industry generally because of the uncertainty of profits in that industry caused by the combination of weather, fluctuations in demand, and perishability of the product. Elision of the limitation Congress placed on the exemption is sacrificed to this end, and the exemption extended to encompass all persons engaged in the production of agriculture. But that drastic restructuring of the statute is not only inconsistent with Congress' specific intent regarding the meaning of the limitation, but is unnecessary to give continuing effect to its broader purposes. Congress clearly intended ... to withhold exempting processors engaged in the production of agriculture notwithstanding that they bore risks common to agriculture generally. ...
> The dissent fails to explain how extending

the exemption in the fashion it suggests can be reconciled with the fundamental purpose of this populist legislation to authorize farmers' cooperatives for collective handling, processing, and marketing purposes.

> The dissent's construction, it seems to me would permit the behemoths of agribusiness to form an exempt association to engage in price fixing, and territorial and market division, so long as these concerns are engaged in the production of agriculture. It is hard to believe that in enacting a provision to authorize horizontal combinations for purposes of collective processing, handling, and marketing so as to eliminate middlemen, Congress authorized firms which integrated further downstream beyond the level at which cooperatives could be utilized for these purposes to combine horizontally as a cartel with license to carve up the national agricultural market. Such a construction would turn on its head Congress' manifest purpose to protect the small, individual economic units engaged in farming from exploitation and extinction at the hands of "these large aggregations of men who control the avenues and agencies through and by which farm products reach the consuming market," 62 Cong.Rec. 2058 (1922) (remarks of Sen. Capper), by exempting instead, and thereby fomenting "these great trusts, these great corporations, these large moneyed institutions" at which the Sherman Act took aim. 21 Cong.Rec. 2562 (1890) (remarks of Sen. Teller). There is nothing in the legislative history, and much to the contrary, to indicate that Congress enacted § 1 to remake agriculture in the image of the great cartels.

> Definition of the term "farmer" cannot be rendered without reference to Congress' purpose in enacting the Capper–Volstead Act. "When technological change has rendered its literal terms ambiguous, the ... Act must be construed in light of [its] basic purpose." *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156, 95 S.Ct. 2040, 2044, 45 L.Ed.2d 84 (1975). I seriously question the validity of any definition of "farmer" in § 1 which does not

limit that term to exempt only persons engaged in agricultural production who are in a position to use cooperative associations for collective handling and processing—the very activities for which the exemption was created. At some point along the path of downstream integration, the function of the exemption for its intended purpose is lost, and I seriously doubt that a person engaged in agricultural production beyond that point can be considered to be a farmer, even if he also performs some functions indistinguishable from those performed by persons who are "farmers" under the Act. The statute itself may provide the functional definition of farmer as persons engaged in agriculture who are insufficiently integrated to perform their own processing and who therefore can benefit from the exemption for cooperative handling, processing, and marketing. Thus, in my view, the nature of the association's activities, the degree of integration of its members, and the functions historically performed by farmers in the industry are relevant considerations in deciding whether an association is exempt.

*Id.* 436 U.S. at 834–36, 98 S.Ct. at 2133–34 (Brennan, J., concurring).

Justice Brennan's interpretation of the Capper–Volstead Act is not only persuasive, but, in the court's opinion, it is the only construction of the statute which is plausible in view of the Act's legislative history. As noted previously, the issue addressed by Justice Brennan is precisely the issue which now confronts this court—i.e., whether a "fully integrated producer of agricultural products performing its own processing ... and which hence does not associate for purposes of common handling, processing, and marketing is nevertheless 'engaged in the production of

agricultural products as [a] farme[r]' for purposes of § 1's exemption ... if also engaged in traditional farming activity." *Id.* at 834, 98 S.Ct. at 2133. The court agrees with Justice Brennan that in order to resolve this issue, consideration must be given to the producer's activities, the degree of integration of the producer, and the functions historically performed by farmers in the industry.

In this case, it is undisputed that each of the entities alleged to have participated in the charged conspiracy is a corporation in the business of independently marketing and distributing processed catfish products. In fact, the defendant makes no claim that these independent processors associated for the purposes of "collective handling and processing—the very activities for which the exemption was created." *Id.* at 835, 98 S.Ct. at 2134 (Brennan, J., concurring).[10] Also undisputed is the fact that Country Skillet and Farm Fresh have integrated downward to the farming level. As representatives from both Country Skillet and Farm Fresh indicated, these processors are "fully integrated," that is, they participate in *all* levels of the production process.

It is also significant that at the time alleged in the indictment, both Country Skillet and Farm Fresh purchased a substantial amount of catfish for processing from independent farmers who sold on the open market. Testimony given at the hearing on this matter established that in this role, these entities, in order to obtain higher profits on their processed products, sought to purchase from the independent farmer at the lowest possible price. These processors were thus acting as traditional "middlemen," the very group which Congress viewed as exploiting

---

10. The government contends that denial of the defendant's motion is required by the fact that the defendant has "failed to identify any formal association through which he and his co-conspirators acted to benefit the farmers." In response to this contention, the defendant makes two arguments: that there was in fact a formal association, the American Catfish Marketing Association (AMCA), and that no such formal association is required by the Capper–Volstead Act. Though the Act and its legislative history seem to suggest the requirement of a formal association, the court concludes that, in view of the court's

grounds for denying the defendant's motion, it is unnecessary to consider this question. In other words, regardless of whether the defendant and his alleged co-conspirators acted pursuant to the ACMA, an organization which, ironically, the defendant stated was spun off from the Catfish Farmers of America to address *processors'* concerns, or pursuant to an informal association, the court is of the opinion that at least two of the alleged co-conspirators, Country Skillet and Farm Fresh, were not qualified to act collectively, either formally or informally, under the Act.

the true farmers it sought to protect under the Capper–Volstead Act. Indeed, it was the disparity of power between "middlemen" and "farmers" at which Congress took aim in enacting the Capper–Volstead Act. Under these circumstances, the court cannot escape the conclusion that any construction of the Capper–Volstead Act which would permit these

> behemoths of agribusiness to form an exempt association to engage in price fixing[, which is alleged in the instant case,] ... would turn on its head Congress' manifest purpose to protect the small, individual economic units engaged in farming from exploitation and extinction at the hands of "these large aggregations of men who control the avenues and agencies through and by which farm products reach the consuming market," 62 Cong.Rec. 2058 (1922) (remarks of Sen. Capper), by exempting instead, and thereby fomenting "these great trusts, these great corporations, these large moneyed institutions" at which the Sherman Act took aim. 21 Cong.Rec. 2562 (1890) (remarks of Sen. Teller).

*Id.* at 834–35, 98 S.Ct. at 2133–34 (Brennan, J., concurring).

The same is true in regard to Country Skillet's and Farm Fresh's relationship with the contract growers—those who actually owned the land and raised the catfish fingerlings from the time they were placed in their ponds until they were taken to the processors' plants. It is apparent to the court that

> extending the exemption to integrators would stand the Act on its head; the integrators who process the fully grown [fish] could thereby combine to dictate the terms upon which they will deal with the contract growers to the latter's disadvantage.... The anomaly of allowing the exemption to those who function more as processors uniquely to disadvantage the contract

grower "producers" who today continue to fall within the conception of "farmers" Congress envisioned in 1922, points up the danger of judicially extending the exemption to conditions unforseen by Congress in 1922.

*Id.* at 837, 839, 98 S.Ct. at 2134–35, 2135–36 (Brennan, J., concurring).

■ The court would further note that it is not the activity of the processors acting as farmers that is being challenged in this case, but rather it is their conduct in selling the finished catfish products that is the subject of the case. And, contrary to the defendant's assertion, the fact that Country Skillet and Farm Fresh own and/or lease catfish ponds does not compel a finding that they are catfish "farmers" within the meaning of the Capper–Volstead Act. Nor does the fact that they must bear similar costs and risks as those actually qualified as "farmers" under the Act. *See National Broiler*, 436 U.S. at 826–27, 98 S.Ct. at 2129–30; *Case–Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384, 393–96, 88 S.Ct. 528, 533–35, 19 L.Ed.2d 621 (1967) (concluding that a cooperative of orange growers, which included some members who operated packing houses but grew no fruit, was not entitled to protection of the Act). If this were the case, large integrated agribusinesses organized to market and sell agricultural products could exempt themselves from the antitrust laws by the simple expedient of purchasing and/or leasing some interest in a farming operation, no matter how *de minimis* the interest. Such a result, however, would undermine Congress' express purpose in enacting both the Sherman and Capper–Volstead Acts.

Having considered all of the above, the court concludes that neither Country Skillet nor Farm Fresh comes within those "farmers" Congress sought to exempt from antitrust liability through the enactment of the Capper–Volstead Act.[11] Even if the purpose

---

11. In the court's opinion, it would be particularly inappropriate to view either Country Skillet or Farm Fresh as "farmers" under Capper–Volstead for the additional reason that catfish farmers in the same areas in which those processors operate formed a Capper–Volstead exempt organization, the Catfish Bargaining Association (CBA), of which neither of those entities is a member.

Specifically, the CBA was formed in part to remedy the perception that the catfish processors were exploiting the farmers. It would be ironic indeed if these processors, against whom the catfish farmers sought protection by forming a collective bargaining organization under the Capper–Volstead Act, were now entitled to claim

behind the Act can no longer be achieved because agriculture is no longer as Congress envisioned at the time of the Act's passage in 1922,

> there would be no warrant for judicially extending the exemption, even if otherwise it would fall into desuetude. In construing a specific, narrow exemption to a statute articulating a comprehensive national policy, we must, of course, give full effect to the specific purpose for which the exemption was established. But when that purpose has been frustrated by changed circumstances, the courts should not undertake to rebalance the conflicting interests in order to give it continuing effect. [citations omitted] Specific exemptions are the product of rough political accommodations responsive to the time and current conditions. If the passage of time has "antiquated" the premise upon which that compromise was struck the exemption should not be judicially reincarnated in derogation of the enduring national policy embodied in the Sherman Act.

*Id.* 436 U.S. at 836–37, 98 S.Ct. at 2134 (Brennan, J., concurring). Because the defendant cannot establish that *"all"* of his alleged co-conspirators were privileged to act collectively under the Capper–Volstead Act, his challenge to the indictment on such basis must fail. *See National Broiler,* 436 U.S. at 822–23, 98 S.Ct. at 2127–28.

Accordingly, the motion of the defendant, Samuel Hinote, to dismiss the indictment against him is denied.

ORDERED.

protection under a statute designed to reduce their relative economic strength.