# Participation by Processor-Owned Catcher Vessels in Inshore Cooperatives Under the American Fisheries Act of 1998

Section 210(b) of the American Fisheries Act of 1998 permits catcher vessels owned by shoreside processors to participate in AFA-authorized fishery cooperatives.

December 10, 1999

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF COMMERCE

You have requested our advice as to the appropriate construction of section 210(b) of the American Fisheries Act, Pub. L. No. 105–277, 112 Stat. 2681–616, 2681–629 (1998) ("AFA"). Specifically, you have asked whether catcher vessels owned by shoreside processors may participate in fishery cooperatives in the inshore sector of the Alaska pollock fishery, which are authorized under section 210(b) of the AFA, or whether participation in such cooperatives is limited to independently owned catcher vessels. *See* Letter for Randolph Moss, Acting Assistant Attorney General, Office of Legal Counsel, from Andrew J. Pincus, General Counsel, Department of Commerce (Aug. 10, 1999) ("Commerce Letter"). As explained more fully below, we conclude that section 210(b) does permit processor-owned catcher vessels to join AFA-authorized fishery cooperatives.

## I. BACKGROUND

A. *The BSAI Fishery*

The Bering Sea and Aleutian Islands ("BSAI") fishery, located in the Bering Sea off the coast of Alaska, is the largest single-species groundfish fishery in the world. In recent years, growing market demand for the Alaskan pollock — a fish used in the United States primarily as an ingredient in breaded fish products and used worldwide for processing into the protein paste surimi — has spurred tremendous growth in the BSAI fishery, with increasing numbers of vessels entering the fishery each year to compete for a share of the annual catch.

The pollock harvested in the BSAI fishery are processed by two competing sectors, inshore (including shoreside) and offshore processors. Inshore processors operate traditional land-based processing plants and floating processors that are moored in a single location for the entire year. They obtain fish either from catcher vessels that are independently owned ("independent catcher vessels") or from vessels in which they or other processors have an ownership interest ("processor-owned catcher vessels"). Offshore processing takes place on factory trawlers (also known as "catcher-processors") or motherships. Catcher-processors are large vessels that harvest pollock and process their own catch. They also purchase fish

250

harvested by catcher vessels and process that catch. Mothership processors are vessels engaged solely in processing; they operate at sea by taking deliveries of fish harvested by catcher vessels and processing them.

The BSAI fishery is managed by the Secretary of Commerce ("Secretary") through the National Marine Fisheries Service ("NMFS") and the North Pacific Fishery Management Council ("Council"). The Council acts as an advisory board and recommends fishery management actions to the Secretary. *See generally* 16 U.S.C. § 1852 (1994). Among the Council's responsibilities is to recommend to the NMFS a "total allowable catch" ("TAC") for each species of fish in the BSAI fishery. *See* 50 C.F.R. § 679.20 (1998). The TAC represents the maximum amount of fish that can be harvested in any given fishing season.

Before 1998, the Council was responsible for recommending to the Secretary how the annual TAC for Alaskan pollock should be allocated between the offshore and inshore components of the BSAI fishing industry. In 1992, the Council recommended an allocation that permitted the offshore sector to harvest sixty-five percent of the pollock TAC, and the inshore sector to harvest thirty-five percent. *See* General Accounting Office, *Fishery Management: Market Impacts of the American Fisheries Act on the Production of Pollock Fillets* 3 (June 1999). Not surprisingly, that percentage allocation was the subject of bitter dispute each year between the offshore and inshore sectors. Moreover, although the Council's allocation formula limited the amount of pollock each sector could harvest, it did not regulate the amount of pollock that individual catcher vessels or catcher-processors could catch. As a result, a "race for fish" ensued within this open access system: each fishing season, vessels within each sector raced to catch as much pollock as possible until their allocation was reached and the season closed. Those vessels that caught the most fish made the most money. Over the years, as more and more vessels joined the race in response to increased market demand for pollock, the fishery suffered increasingly from overcapitalization and inefficiency.

## B. *The American Fisheries Act of 1998*

In 1998, Congress enacted the AFA to address some of these problems. Senator Breaux, one of the AFA sponsors, described the legislation as "another major milestone in our long efforts to reserve U.S. fishery resources for bona fide U.S. citizens as well as take steps to substantially improve the conservation and management of our Nation's fishery resources through a reduction in the overcapitalization of our fishing fleets." 143 Cong. Rec. S10,299 (daily ed. Oct. 1, 1997) (statement of Sen. Breaux). The sponsors of the AFA thus sought to accomplish three goals — "Americanization, decapitalization, and rationalization" of the BSAI fishery. *See* 144 Cong. Rec. S12,801 (daily ed. Oct. 21, 1998) (statement of Sen. Gorton); *see also id.* at S12,777 (statement of Sen. Stevens).

Subtitle I of the AFA attempts to achieve "Americanization" by imposing new ownership requirements on U.S. flag vessels. *See* AFA § 202, 112 Stat. at 2681–617 to 2681–618. Subtitle I also partly addresses the problem of overcapitalization of the fishery by placing limits on the size of new vessels in U.S. waters. *See id.*

Subtitle II of the AFA advances the goals of "decapitalization" and "rationalization" through various provisions that reduce excess capacity in the fishery and substitute a comprehensive management scheme for the pre-existing open access system. Section 206 deals with the question of the appropriate allocation of the pollock TAC by establishing statutory allocations for the offshore and inshore sectors. After setting aside ten percent of the TAC as a directed fishing allowance for the western Alaska community development quota program, section 206 divides the remainder of the TAC equally between the inshore and offshore processing sectors. *See* § 206(a)–(b)(1). The offshore sector allocation is split further, with catcher-processors and the catcher vessels supplying them receiving forty percent of the TAC and the catcher vessels harvesting pollock for motherships receiving ten percent. *See* § 206(b)(2)–(b)(3).

Sections 207 through 209 aim to streamline and restructure the BSAI industry. Sections 207 and 209 provide for a buyout of nine predominantly foreign-owned catcher-processors that will henceforth be ineligible to participate in the BSAI fishery. Section 208 limits participation in the fishery by establishing strict eligibility requirements for vessels and processors in both the offshore and inshore sectors. *See* § 208(a) (eligibility requirements for catcher vessels delivering to shoreside processors); § 208(b) (listing eligible catcher vessels delivering to catcher-processors and eligibility criteria for other catcher vessels delivering to catcher-processors); § 208(c) (listing eligible catcher vessels delivering to motherships and eligibility criteria for other catcher vessels delivering to motherships); § 208(d) (listing eligible motherships); § 208(e) (listing eligible catcher-processors); § 208(f) (eligibility criteria for shoreside processors).

Section 210 of the AFA, the provision at issue here, seeks to eliminate the race for fish by providing a framework for the formation of fishery cooperatives in each of the BSAI processing sectors. *See* § 210(b) (cooperatives of catcher vessels delivering fish to shoreside processors), § 210(c) (cooperatives of catcher vessels delivering fish to catcher-processors), § 210(d) (cooperatives of catcher vessels delivering fish to motherships). Although certain types of fishery cooperatives were already authorized under the Fisherman's Collective Marketing Act of 1934, 15 U.S.C. § 521 (1994) ("FCMA"), section 210 provides a powerful incentive for the creation of fishery cooperatives: It reserves a certain percentage of the TAC for the members of each cooperative, thereby guaranteeing them a share of the fish that they can harvest at their own pace.

The precise criteria for the establishment of AFA fishery cooperatives in the inshore processing sector are set out in subsection 210(b). Under those criteria,

if eighty percent or more of the ''qualified catcher vessels'' that delivered pollock to a particular shoreside processor the previous year sign ''a contract implementing a fishery cooperative under subsection (a)'' — i.e., a contract under section 1 of the FCMA — and if these vessels further agree to deliver pollock only to that particular shoreside processor (and the processor agrees to process the pollock), then the Secretary of Commerce may establish a separate allocation for the cooperative. § 210(b)(1). That allocation would be equal to the average percentage of the TAC that the vessels in the cooperative caught during 1995, 1996 and 1997. *See id.* If a fishery cooperative is formed, section 210(b)(2) requires the cooperative to permit other catcher vessels that delivered most of their catch to that shoreside processor to join the cooperative under the same terms and conditions as member vessels. *See* § 210(b)(2).

Catcher vessels that participate in a fishery cooperative under section 210(b) may harvest only the pollock that is allocated to them by the Secretary; they are not allowed to harvest any of the pollock that remains in the ''open access'' portion of the inshore allocation under section 206(b)(1). *See* § 210(b)(5). The open access allocation is equivalent to that portion of the inshore allocation that has not been reserved by the Secretary for fishery cooperatives. *See id.*

## II. DISCUSSION

The question before us is whether catcher vessels that are owned by shoreside processors may participate in fishery cooperatives under section 210(b) of the AFA. Section 210(b)(1), which creates the entitlement of fishery cooperatives to a portion of the TAC, provides:

(b) **Catcher Vessels Onshore** —

(1) **Catcher vessel cooperatives.** — Effective January 1, 2000, upon the filing of a contract implementing a fishery cooperative under subsection (a) which —

(A) is signed by the owners of 80 percent or more of the qualified catcher vessels that delivered pollock for processing by a shoreside processor in the directed pollock fishery in the year prior to the year in which the fishery cooperative will be in effect; and

(B) specifies, except as provided in paragraph (6), that such catcher vessels will deliver pollock in the directed pollock fishery only to such shoreside processor during the year in which the fishery cooperative will be in effect and that such shoreside processor has agreed to process such pollock,

the Secretary shall [set aside a fishing allowance from the inshore allocation of the TAC for that fishery cooperative].

Section 210(b)(1) points to two possible statutory bases for limiting eligibility to independently owned vessels. First, the AFA by its own terms might impose the limitation. Second, the reference in section 210(b)(1) to "a contract implementing a fishery cooperative under subsection (a)" might effectively incorporate limits from the FCMA, since subsection (a) refers to "a contract implementing a fishery cooperative" under the FCMA.

A. *Language and Legislative History of AFA*

Taken by itself, the AFA does not restrict eligibility to independently owned catcher vessels. Section 210(b)(3) defines "qualified catcher vessel" as follows:

> **Qualified catcher vessel.** — For the purposes of this subsection, a catcher vessel shall be considered a "qualified catcher vessel" if, during the year prior to the year in which the fishery cooperative will be in effect, it delivered more pollock to the shoreside processor to which it will deliver pollock under the fishery cooperative in paragraph (1) than to any other shoreside processor.

Nothing in this definition suggests an ownership limitation. Pursuant to section 210(b)(3), whether or not a catcher vessel is "qualified" under the AFA to participate in a fishery cooperative linked to a particular shoreside processor depends upon whether the vessel delivered the majority of its catch to that processor, not upon its ownership structure.

Nor does the definition of the underlying term "catcher vessel" contain any ownership-based restriction. "Catcher vessel" is defined in section 205(3) of the AFA as "a vessel that is used for harvesting fish and that does not process pollock onboard." What this definition excludes are boats that process fish onboard — catcher/processors (*see* § 205(2)) and motherships (*see* § 205(8)) — but it does not, by its own terms, exclude vessels on the basis of ownership.

Further clarification of the scope of the term "catcher vessel" appears in subsections 208(a) and (c). Section 208 generally sets forth eligibility criteria for catcher vessels participating in the inshore and offshore sectors of the BSAI fishery. Under section 208(a), eligibility to harvest pollock for the inshore sector is limited to those catcher vessels that: (1) either have delivered at least 250 metric tons of pollock to a shoreside processor in 1996, 1997 or 1998, or are less than sixty feet long and have delivered at least forty metric tons of pollock to a shoreside processor in any of those years; (2) have an approved license to harvest pollock; and (3) are not listed in subsection 208(b) (which lists catcher vessels

eligible to deliver pollock to catcher/processors). *See* § 208(a)(1). None of these eligibility criteria relates in any way to ownership of the catcher vessel.

Subsection 208(c), which defines the eligibility of catcher vessels delivering pollock to motherships, also offers textual support for an interpretation of "catcher vessel" that makes no distinction based on ownership. Section 208(c) lists specifically named "catcher vessels" that remain eligible to harvest the portion of the TAC allocated to motherships. While some of the catcher vessels identified in section 208(c) are independently owned, many of those listed are owned wholly or in part by a mothership. *See* Robert Halvorsen et al., "Discussion Paper on Inshore Sector Catcher Vessel Cooperatives in the Bering Sea/Aleutian Islands Pollock Fisheries" at Appendix C (Sept. 13, 1999) ("University of Washington Discussion Paper") (listing vessels participating in BSAI fishery and their ownership structure). By including both independently owned vessels and mothership-owned vessels within the list of eligible "catcher vessels," section 208(c) extends the scope of that term to vessels owned by an entity within one of the processing sectors. Although none of the vessels listed in section 208(c) is owned by a shore-side processor,[1] section 208(c) makes clear that the term "catcher vessel" is not limited to non-processor-owned boats. Since there is nothing in the definition of "catcher vessel" to distinguish between different types of processor owners, it follows that the term "catcher vessel" includes boats owned by shoreside processors as well.

The overall purpose animating section 210(b), as revealed in the language and history of the provision, supports this inclusive definition. Rather than placing any ownership limitation on vessel participation in cooperatives, section 210(b) expressly encourages broad participation in inshore cooperatives by all vessels. Section 210(b)(2) provides that "[a]ny contract implementing a fishery cooperative under paragraph (1) must allow the owners of other qualified catcher vessels to enter into such contract after it is filed . . . under the same terms and conditions as the owners of the qualified catcher vessels who entered into such contract upon filing." The conference report to the AFA explains that this provision extends the authority to join cooperatives to all qualified catcher vessels "on a class-wide basis":

> If a fishery cooperative is formed, other catcher vessels that delivered most of their catch to that shoreside processor would be required to be allowed to join the fishery cooperative under the same terms and conditions as other participants at any time before the calendar year in which fishing under the cooperative will begin. . . . The vessels eligible to harvest pollock allocated for processing by shoreside processors would continue to have the

---

[1] This comes as no surprise, since a catcher vessel owned by a shoreside processor would likely be delivering the majority of its catch to that shoreside processor, not to a mothership

authority to form a fishery cooperative on a class-wide basis as well.

144 Cong. Rec. S12,780 (daily ed. Oct. 21, 1998).

Moreover, the manner in which Congress chose to structure fishery cooperatives for the inshore sector requires the participation of shoreside processor-owned catcher vessels in order to achieve the goal for which AFA cooperatives were being established: to end the race for fish. In order for a fishery cooperative to be formed under section 210(b), the owners of eighty percent or more of the qualified catcher vessels that delivered pollock to a particular shoreside processor in the previous year must agree to join the cooperative. *See* § 210(b)(1). In 1998, however, processor-owned vessels apparently made up over twenty percent of the total number of vessels delivering pollock to six out of seven shoreside processors. *See* University of Washington Discussion Paper at 46. Thus, if processor-owned vessels were excluded from participating in AFA cooperatives, six out of seven of the potential cooperatives that might be formed under the AFA could not reach the eighty percent threshold for vessel participation. In other words, if participation in AFA cooperatives was limited to independently owned vessels, only one cooperative could be formed pursuant to the requirements of section 210(b). *See* Commerce Letter at 1–2.

Similarly, if processor-owned vessels were excluded from AFA cooperatives, none of the fishery cooperatives that Congress intended to create within the mothership sector pursuant to section 210(d) could be formed. Like section 210(b), section 210(d) permits "the filing of a contract implementing a fishery cooperative under [section 1 of the FCMA]." § 210(d)(1). These contracts must be entered into "by the owners of 80 percent or more of the catcher vessels eligible under 208(c)." *Id.* The latter provision lists 19 named vessels, 13 of which are processor-owned. Section 208(c) includes a provision allowing additional vessels to be added to this list, but only if the Secretary of Commerce makes certain factual findings and the new vessel is eligible to harvest pollock under a license limitation program recommended by the North Pacific Council. *See* § 208(c)(20)(A), (B). Unless an additional 46 independently owned boats were added to this list by January 1, 2000, there would be no possibility that 80 percent of the catcher vessels eligible under section 208(c) could be independently owned. Because one of the central aims of the AFA was to *reduce* excess capacity in the fishery, it is obvious that Congress did not intend to authorize the creation of FCMA cooperatives within the mothership sector only if the number of catcher vessels within that sector more than tripled, from 19 to 65. Section 210(d), therefore, confirms that Congress expected processor-owned vessels to enter into contracts "implementing a fishery cooperative under" the FCMA.

Thus, interpreting the AFA to exclude processor-owned vessels would essentially defeat the primary purpose of the Act, which was to encourage the formation

of fishery cooperatives in order to end the annual race for fish. As noted above, *see supra* p. 253, under section 210(b)(5), catcher vessels that do not participate in a fishery cooperative may harvest pollock from that portion of the inshore allocation that is reserved for open access. If only a small number of catcher vessels join cooperatives, the percentage of the TAC set aside for cooperatives will also be small, leaving a correspondingly greater percentage of the TAC available for open access, with a large number of non-cooperative vessels competing for a portion of that catch. The race for fish would continue.

The legislative history of the AFA likewise confirms that Congress intended fishery cooperatives to play a critical role in ending the race for fish. As Senator Murray explained during the Senate debate on the AFA,

> This bill relies in great measure on the ability and willingness of the North Pacific pollock fishery sectors to form fishery cooperatives. Fishery cooperatives, authorized under current law, are a privately negotiated allocation on a company-by-company or vessel-by-vessel basis of a portion of the total allowable catch. Similar to an individual fishing quota program, cooperatives provide fishery participants with the certainty they need to stop the race for fish, and harvest and process the fish on a more flexible schedule with greater attention to bycatch, efficiency, and safety. The existing fishery cooperative in the offshore sector of the Pacific Whiting fishery has shown tremendous benefits in these regards and has helped rationalize the fishery. It is hoped that cooperatives can do the same in the pollock fishery.

144 Cong. Rec. S12,708 (daily ed. Oct. 20, 1998) (statement of Sen. Murray).

It can reasonably be assumed that, in crafting cooperatives as a solution to the open access problem, Congress was familiar with the BSAI fishing industry and its various components. *Cf. Rodriguez v. Peters*, 63 F.3d 546, 567 (7th Cir. 1995). More particularly, it is clear that Congress was aware of the extent to which the shoreside processing sector was vertically integrated and that Congress did not intend to omit processor-owned boats from the fishery cooperatives whose formation was essential to the purposes of section 210. The clear language of the AFA and its legislative history and purpose thus demonstrate a congressional intent to include processor-owned vessels in fishery cooperatives under section 210(b).[2]

---

[2] To be sure, the purpose of section 210(b) could also be achieved if processors sold their catcher vessels to independent operators The legislative history, however, makes no reference to such divestiture, and it seems unlikely that Congress, without even referring to divestiture, would make the entire success of section 210(b) rest on this contingency.

**B.** *Section 210(b) Reference to FCMA Cooperatives*

We now turn to the question whether the reference in subsection 210(b) to "fishery cooperative[s] under subsection (a)," which refers to the fishery coopera- tive provision of the FCMA, 15 U.S.C. § 521, places any limitations on the forma- tion of cooperatives under the AFA. The National Oceanographic and Atmospheric Administration ("NOAA") does not dispute the conclusion that the text and legis- lative history of the AFA indicate a congressional intent to include processor- owned vessels in cooperatives under section 210(b). However, NOAA argues that, by referring to FCMA fishery cooperatives under section 210(b), Congress nec- essarily incorporated into the AFA cooperatives those eligibility restrictions that apply to FCMA cooperatives. *See* Letter for Randolph Moss, Acting Assistant Attorney General, Office of Legal Counsel, from Monica P. Medina, General Counsel, National Oceanographic and Atmospheric Administration (June 7, 1999) ("NOAA Letter"). And because NOAA interprets the FCMA to preclude the participation of processor-owned vessels, it concludes that, likewise, processor- owned vessels are ineligible to participate in cooperatives under § 210(b) of the AFA. *See id.* at 5.

Because the question of the interplay between the FCMA and the AFA is rel- evant to a proper interpretation of section 210(b), we will briefly discuss the anti- trust exemption under the FCMA and the statute upon which it is modeled, the Capper-Volstead Act, 7 U.S.C. § 291 (1994), before returning to the AFA.

1. *Integrated Processors under the FCMA and the Capper-Volstead Act*

The FCMA grants an exemption from antitrust liability for certain collective activities in the fishing industry. Specifically, it provides:

> Persons engaged in the fishery industry, as fishermen, catching, col- lecting, or cultivating aquatic products, . . . may act together in associations, corporate or otherwise, with or without capital stock, in collectively catching, producing, preparing for market, proc- essing, handling, and marketing in interstate and foreign commerce, such products of said persons so engaged. . . . Such associations may have marketing agencies in common, and such associations and their members may make the necessary contracts and agree- ments to effect such purposes.

15 U.S.C. § 521. The FCMA exemption was patterned after a similar antitrust exemption for agricultural activities, set forth in section 1 of the Capper-Volstead Act, 7 U.S.C. § 291. In fact, the only court that has considered the scope of the FCMA exemption concluded that "though there are some differences between

Capper-Volstead and the Fisherman's Act, the two Acts provide exemptions from antitrust liability for essentially the same activities." *United States v. Hinote*, 823 F. Supp. 1350, 1354 n.7 (S.D. Miss. 1993).

The Supreme Court considered the scope of the Capper-Volstead exemption in *National Broiler Mktg. Ass'n v. United States*, 436 U.S. 816 (1978) ("*NBMA*"). In *NBMA*, the United States brought a civil action against a nonprofit cooperative association of producers of broiler chickens — the NBMA — alleging a conspiracy in violation of section 1 of the Sherman Act. The question before the Court was whether a producer of broiler chickens, which did not own a breeder flock or hatchery, could nevertheless qualify as a "farmer" within the meaning of the Capper-Volstead Act. *See id.* at 817. After reviewing the legislative history of the Capper-Volstead Act, the Court concluded that it could not:

> We, therefore, conclude that any member of NBMA that owns nei-
> ther a breeder flock nor a hatchery, and that maintains no grow-
> out facility at which the flocks to which it holds title are raised,
> is not among those Congress intended to protect by the Capper-
> Volstead Act. The economic role of such a member in the produc-
> tion of broiler chickens is indistinguishable from that of the proc-
> essor that enters into a preplanting contract with its supplier, or
> from that of a packer that assists its supplier in the financing of
> his crops. . . . We hold that such members are not "farmers," as
> that term is used in the Act, and that a cooperative organization
> that includes them — or even one of them — as members is not enti-
> tled to the limited protection of the Capper-Volstead Act.

*Id.* at 827–29 (footnotes omitted).

In coming to this conclusion, the Court specifically reserved the question of the status of the integrated producer:

> [W]e need not consider here the status under the Act of the fully
> integrated producer that not only maintains its own breeder flock,
> hatchery, and grow-out facility, but also runs its own processing
> plant. Neither do we consider the status of the less fully integrated
> producer that, although maintaining a grow-out facility, also con-
> tracts with independent growers for a large portion of the broilers
> processed at its facility.

*Id.* at 829 n.21. In a concurring opinion, Justice Brennan did address these ques-
tions reserved by the Court. He reviewed the legislative history of the Capper-
Volstead Act, and asserted that "Congress' manifest purpose to protect the small,
individual economic units engaged in farming," *id.* at 835 (Brennan, J., concur-
ring), precluded automatic extension of the exemption to the integrated producer:

> I seriously question the validity of any definition of "farmer" in
> § 1 which does not limit that term to exempt only persons engaged
> in agricultural production who are in a position to use cooperative
> associations for collective handling and processing — the very
> activities for which the exemption was created. At some point along
> the path of downstream integration, the function of the exemption
> for its intended purpose is lost, and I seriously doubt that a person
> engaged in agricultural production beyond that point can be consid-
> ered to be a farmer . . . . Thus, in my view, the nature of the
> association's activities, the degree of integration of its members,
> and the functions historically performed by farmers in the industry
> are relevant considerations in deciding whether an association is
> exempt.

*Id.* at 835–36.

Only one court has actually ruled on the question whether an integrated producer
is entitled to Capper-Volstead or FCMA exemption. In *United States v. Hinote*,
823 F. Supp. 1350, 1359 (S.D. Miss. 1993), the district court, relying largely upon
Justice Brennan's concurrence, concluded that catfish processors could not take
advantage of the antitrust exemption under the FCMA solely by purchasing or
leasing some interest in a catfish farming operation. The court reasoned that if
it were to come to the opposite conclusion,

> large integrated agribusinesses organized to market and sell agricul-
> tural products could exempt themselves from the antitrust laws by
> the simple expedient of purchasing and/or leasing some interest in
> a farming operation, no matter how de minimis the interest. Such
> a result, however, would undermine Congress' express purpose in
> enacting both the Sherman and Capper-Volstead Acts.

*Id.* There is certainly support in the legislative history of the Capper-Volstead
Act for this conclusion, much of which is catalogued by Justice Brennan in his
*NBMA* concurrence. However, as Justice White recognized in his dissent in
*NBMA*, there is also conflicting evidence in the history and language of the statute
that might lead to the opposite conclusion. 436 U.S. at 844–49.

While we understand that it is generally assumed that integrated producers and
processors may not participate in exempted cooperatives, the sparse case law inter-
preting the scope of the FCMA and Capper-Volstead exemptions cannot be said
to have dispositively resolved the question. However, as we discuss in the next
section, we need not decide that question in order to determine whether processor-
owned vessels may participate in the cooperatives authorized under section 210(b).

## 2. *Reconciling the FCMA with the AFA*

It is a well-established principle of statutory interpretation that the law favors rational and sensible construction. *See, e.g.*, 2A Norman J. Singer, *Sutherland Statutory Construction* § 45.12 (5th ed. 1992). Thus, if there exists some reasonable interpretation that reconciles two otherwise allegedly inconsistent statutes in a manner that does not destroy or hinder the intent or meaning of either one, that interpretation is favored. *See id.* Moreover, if a statute is capable of more than one interpretation, it should be construed to effectuate its underlying purpose. *See Norwest Bank of North Dakota, N.A. v. Doth*, 159 F.3d 328, 333 (8th Cir. 1998); *cf. United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (stressing that, "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy") (quoting *United States v. Heirs of Boisdore*, 49 U.S. (How.) 113, 122 (1849)). Applying these principles to the case before us, we must, if possible, construe the cross-reference to FCMA cooperatives in section 210(b) in a reasonable manner that is both consistent with the purposes of the AFA and compatible with section 1 of the FCMA.

Congress's primary purpose in enacting section 210 was to encourage the formation of as many fishery cooperatives as possible in order to rationalize the BSAI fishery and end the race for fish. *See supra* pp. 256–57. Congress chose to effectuate this purpose for the inshore sector of the BSAI fishery by creating "catcher vessel cooperatives" under section 210(b). Congress chose also to define section 210(b) cooperatives by cross-referencing the FCMA. Because the participation of processor-owned vessels in section 210(b) cooperatives was critical to achieving Congress's purpose, Congress must have intended that such vessels would be included in cooperatives under the FCMA.[3] In interpreting section 210(b)'s cross-reference to the FCMA, therefore, we are presented with three possibilities: (1) Congress was mistaken about the scope of the FCMA, which excludes such integrated processors, and processor-owned vessels may not participate in cooperatives under section 210(b); (2) Congress correctly understood the FCMA to include integrated processors, and processor-owned vessels may participate in cooperatives under section 210(b); or (3) Congress has in the AFA effectively declared that, regardless of the actual scope of the FCMA in other contexts, processor-owned vessels may participate in FCMA fishery cooperatives in the BSAI fishery. Of these three possible interpretations, we must reject the first because it so plainly frustrates the purpose of the AFA. We need not decide between the second and third possible interpretations, however, because, under either, it is clear

---

[3] Of course, it might be argued that Congress deliberately referred to the FCMA cooperatives in section 210(b) in order to exclude processor-owned boats from AFA cooperatives However, there is nothing in the legislative history of the statute to support such an assertion, and there is significant evidence to the contrary. *See supra* pp 253–57 Thus, we do not think this interpretation of the reference to the FCMA merits consideration

that catcher vessels owned by shoreside processors may participate in the fishery cooperatives authorized by section 210(b) of the AFA.

The first of these interpretations assumes the conclusion reached by NOAA, namely that the FCMA does not permit integrated processors to participate in cooperatives under 15 U.S.C. § 521. To argue further, as NOAA does, that this cross-reference necessarily incorporates the limitations of FCMA cooperatives into the AFA scheme requires us to conclude that Congress mistakenly assumed that FCMA cooperatives could include integrated processors and, as a result, enacted a provision that cannot operate as Congress intended. Moreover, as we have already observed, if processor-owned vessels are excluded from participating in cooperatives under section 210(b), only one fishery cooperative could be formed under section 210(b), thereby thwarting the primary purpose of section 210. Thus if we accept this first interpretation, we render section 210(b) practically ineffective.[4]

We are reluctant to adopt a construction of a statute that presumes congressional error and that renders its provisions either ineffective or contrary to stated legislative objectives. The "unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result." 2A Singer, Sutherland Statutory Construction § 45.12; *see also American Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982) ("Statutes should be interpreted to avoid . . . unreasonable results whenever possible.").

We therefore look to the two other proposed interpretations to see if they offer a more reasonable result that achieves the AFA's underlying purposes. The second interpretation accomplishes these goals because it would allow processor-owned catcher vessels to join cooperatives under both the FCMA and the AFA. Of course, this interpretation would require us to determine that integrated processors may participate in fishery cooperatives under the FCMA, a conclusion that cannot be said to be settled under the case law and that we understand may have profound implications for both the fishing and other industries. We are therefore reluctant to rely upon this conclusion, and need not do so because, even if the FCMA exemption does not cover integrated processors, we believe Congress's intent to permit the formation of cooperatives under section 210(b) that include processor-owned vessels can still be given effect under the third interpretation.

The third interpretation posits that Congress declined to express or assume a view concerning the scope of the FCMA generally and instead decided that, regardless of whether processor-owned vessels are permitted to participate in all cooperatives under the FCMA, they should participate in the FCMA cooperatives

---

[4] It might be argued that the fact that one cooperative of independently owned catcher vessels could be formed under the provisions of section 210(b) is sufficient to render this interpretation viable. However, in light of Congress's clear intent in section 210(b) to encourage the formation of cooperatives on a "class-wide basis," we think such an interpretation would in fact "thwart the obvious purpose of the statute." *In Re Trans Alaska Pipeline Rate Cases*, 436 U S 631, 643 (1978). Moreover, as noted above, *see supra* pp 256–57, this interpretation would completely nullify section 210(d)

authorized by the AFA. By referring to the FCMA in a statute that intended to include integrated processors in its fishery cooperatives, Congress effectively determined that, at least for the purpose of BSAI directed pollock fisheries, processor-owned vessels are entitled to participate in cooperatives that enjoy FCMA antitrust immunity.

"[W]here . . . Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Lorillard v. Pons*, 434 U.S. 575, 581 (1978). Here, however, as noted above, there was no dispositive judicial interpretation of the scope of either the FCMA or the Capper-Volstead Act to guide Congress when it enacted the AFA in 1998. Moreover, because it was not actually amending the FCMA, Congress had no reason in the AFA to settle this far-reaching issue. *Cf. Pierce v. Underwood*, 487 U.S. 552, 567 (1988) (stating that "it is the function of the courts and not the Legislature, much less a Committee of one House of the Legislature, to say what an enacted statute means"); *Patsy v. Board of Regents of the State of. Florida*, 457 U.S. 496, 508–09 (1982) (according interpretive weight to views of a subsequent Congress where that Congress acted in light of settled rule that exhaustion is not required in section 1983 actions and imposed an exhaustion requirement for a discrete class of 1983 claims). Rather, all that was required was for Congress to determine that processor-owned vessels should be allowed to participate in AFA cooperatives that enjoy FCMA immunity.

The language of section 210 offers textual support for the view that Congress legislated in this limited manner. Notably, while it authorized the execution of contracts "implementing a fishery cooperative under" the FCMA, Congress did not describe the signatories to such contracts by cross-reference to the FCMA. Thus, it did not authorize "fishermen, within the meaning of the FCMA, who own qualified catcher vessels" to enter into contracts under section 210. Nor did it authorize "owners of qualified catcher vessels otherwise eligible to form FCMA cooperatives" to do so. Indeed, Congress did not use any of the FCMA's operative terms — "persons," "fishermen," "planters" — in specifying who could participate in section 210(b) cooperatives entitled to antitrust immunity. Instead, Congress provided that FCMA contracts under section 210(b)(1) be signed by "owners" of "qualified catcher vessels," and nothing in the statutory definition of "qualified catcher vessels" suggests any limitation based on ownership or vertical integration. The text of the statute is thus entirely consistent with a congressional intent to permit integrated processors to participate in FCMA cooperatives for purposes of the AFA, whether or not such entities could participate in FCMA cooperatives generally. *Cf. Lorillard*, 434 U.S. at 582 (construing one statute in light of congressional "selectivity . . . in incorporating provisions and modifying certain . . . practices" under an earlier statute that Congress incorporated by reference in the subsequent statute).

Unlike the first interpretation we outlined above, the third interpretation effectuates Congress's underlying purpose in the AFA while simultaneously reconciling the AFA with the FCMA. It best gives effect to Congress's express intent: that all catcher vessels, both independently-owned and processor-owned, participate in FCMA fishery cooperatives under the AFA so that the race for fish in the BSAI fishery can be ended. Particularly in light of the fact that there is no clearly settled law on the question whether, and if so, under what circumstances, integrated processors can participate in FCMA cooperatives, that congressional intent should control here.[5]

This interpretation does not require us to accept or reject Justice Brennan's interpretation of the Capper-Volstead Act or the *Hinote* court's view concerning the scope of the FCMA. As we read section 210, Congress did not take any position on the scope of the FCMA — a statute it left entirely undisturbed — and instead effectively declared that, whatever the scope of that statute generally, processor-owned vessels could participate in pollock fishery cooperatives entitled to FCMA immunity.

In any event, Justice Brennan's analysis in *NBMA* is simply inapplicable here. In his concurring opinion, Justice Brennan concluded that the Capper-Volstead exemption should not extend to those who are not "in a position to use cooperative associations for collective handling and processing," 436 U.S. at 835–36, presumably those who already have their own processing capacity. The purpose of cooperatives under the AFA, however, is not to facilitate collective processing — in fact, each cooperative that might be formed under section 210(b) is expressly tied to an existing shoreside processor that is responsible for processing the catch of the cooperative. Rather, cooperatives under the AFA are formed for the purpose of receiving a guaranteed allocation of the pollock TAC, thereby permitting members of the cooperative to fish more efficiently and safely. It thus makes no sense to evaluate the eligibility of participants in AFA cooperatives on the basis of their ability to use the cooperative only for purposes of collective processing.

We do not share NOAA's concern that this third interpretation is inconsistent with section 210(d), which expressly extends the antitrust exemption under the FCMA to processing activities by motherships. NOAA argues that, because, Congress expressly extended the reach of the FCMA to include one type of processor in section 210(d), we should not read such an extension into § 210(b) on an implied basis. *See* NOAA Letter at 4 n.4. However, the principle *expressio unius*

---

[5] In fact, as noted above, under this interpretation, the scope of the FCMA in other contexts is irrelevant to the result. If the FCMA permits integrated processors to participate in cooperatives in other contexts, then the AFA simply makes clear that this authority applies to all catcher vessels in the BSAI fishery, including those owned by processors, and encourages them to take advantage of the existing authority by offering catcher vessel cooperatives a guaranteed allocation of the TAC. If the FCMA does not permit integrated processors to participate in cooperatives in other contexts, Congress's intent that they be permitted to participate in FCMA cooperatives for the purpose of harvesting pollock in the BSAI fishery is a decision to extend FCMA immunity to a limited group of processor-owned vessels operating in a single fishery.

*est exclusio alterius* is a canon of statutory construction, not a rule of law, and can be overcome by a showing of contrary legislative intent or policy: "[W]hether the specification of one matter means the exclusion of another is a matter of legislative intent for which one must look to the statute as a whole." 2A Singer, *Sutherland Statutory Construction* § 47.25 n.1 (citing *Massachusetts Trustees of E. Gas & Fuel Assocs. v. United States*, 312 F.2d 214 (9th Cir. 1963)); *see also United States v. Barnes*, 222 U.S. 513, 519 (1912) ("The maxim invoked [*expressio unius*] expresses a rule of construction, not of substantive law, and serves only as an aid in discovering the legislative intent when that is not otherwise manifest. In such instances it is of deciding importance; in others, not."). Given the strong evidence in the AFA that Congress intended integrated processors to participate in all fishery cooperatives in the BSAI fishery, we do not find the maxim persuasive here.

A narrower reading of section 210(b) might also be urged based upon the rule that "[r]epeals of the antitrust laws by implication from a regulatory statute are strongly disfavored," *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 350 (1963). This rule comes into play, however, only if the FCMA does not extend to processor-owned vessels, a question we need not decide. Morever, even if we assume that the FCMA does not include such vessels, we believe that this is one of those unusual situations that presents a case of "plain repugnancy between the antitrust and regulatory provisions," *id.* at 351, a rare exception to the general rule. Where, as here, "Congress has made a judgment that [certain] restrictions on competition might be necessitated by the unique problems of" a particular industry, "the antitrust laws must give way if the regulatory scheme established" by that statute is to work. *United States v. National Ass'n of Securities Dealers, Inc.*, 422 U.S. 694, 729–30 (1975). Congress's purpose in enacting the AFA was to increase efficiency by decreasing excess capitalization and ending the race for fish, and its mechanism for achieving that purpose was the creation of fishery cooperatives that are necessarily exempt from antitrust liability.

Indeed, in the context of the BSAI fishery, where there is a fixed quota of fish in a highly regulated industry, the creation of fishery cooperatives does not undermine the goals of the antitrust laws. In the related context of the Pacific Whiting fishery, the Antitrust Division recognized that "reliance on an olympic race system to gather a fixed quota of fish 'is both inefficient and wasteful,' " and concluded that "eliminating the race will increase processing efficiency and concomitantly the output of [fish]." Letter for Joseph M. Sullivan, Esq., Mundt, MacGregor, Happel, Falconer, Zulauf & Hall, from Joel L. Klein, Acting Assistant Attorney General, Antitrust Division at 3 (May 20, 1997). The Antitrust Division further determined that, in such a fixed quota setting, elimination of the race for fish was unlikely to have an anticompetitive effect: "[E]limination of the race to gather an input whose output is fixed by regulation seems unlikely to reduce output or increase price under any likely scenario." *Id.* Thus, from the perspective

of antitrust principles, there is no reason to read section 210(b) narrowly; on the contrary, reading section 210(b) broadly to facilitate the formation of as many fishery cooperatives as possible would ultimately allow for greater efficiency in processing and might have procompetitive effects.[6] *Cf. id.* at 3–4 ("To the extent that the proposed agreement allows for more efficient processing that increases the usable yield (output) of the processed Pacific Whiting and/or reduces the inadvertent catching of other fish species whose preservation is also a matter of regulatory concern, it could have procompetitive effects.").

In short, there exists at least one interpretation of section 210(b) that is consistent with its text and effectuates the purposes of the AFA. Because a statute should be interpreted whenever possible to effectuate Congress's purposes, and because it is possible to do so here, we conclude that processor-owned vessels may participate in section 210(b) cooperatives. In light of this conclusion, we need not resolve the further question whether the FCMA generally permits such vessels to participate in cooperatives that enjoy antitrust immunity.

## CONCLUSION

The language and the legislative history of the AFA indicate that Congress intended processor-owned catcher vessels to participate in inshore cooperatives under the AFA. Because section 210(b) can be read in a manner consistent with that intention, we conclude that processor-owned catcher vessels may join fishery cooperatives under the AFA.

RANDOLPH D. MOSS
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[6] Our conclusion that processor-owned vessels may participate in FCMA cooperatives under the AFA is therefore unlikely to lead to anticompetitive results Nevertheless, to minimize the possibility of negative effects on the fishing industry, Congress included within the AFA several provisions designed to eliminate potentially adverse economic consequences. *See, e.g.*, § 213(c)(1) (granting the North Pacific Council the authority to recommend conservation and management measures "that supersede the provisions of this title . . to mitigate adverse effects in fisheries or on owners of fewer than three vessels in the directed pollock fishery caused by . . fishery cooperatives in the directed pollock fishery"); *see also* 144 Cong Rec. S12,708 (daily ed. Oct. 20, 1998) (statement of Sen. Murray) ("In the interest of ensuring that small, independent fishermen are the true beneficiaries of fishery cooperatives, the bill includes a number of requirements for fishery cooperatives in all three sectors which are designed to provide these small, independent fishermen with sufficient leverage in the negotiations to protect their interests.") Thus, should shoreside processors in the BSAI fishery affiliate with catcher vessels for no purpose other than to engage in anticompetitive conduct under the umbrella of antitrust exemption, the AFA would appear to give the Council the authority to check such abuses